IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re ) | |
| ) | |
| DAREN SCOTT BERG, ) | Case No. 08-20184 |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |
| TORRINGTON LIVESTOCK CATTLE ) | |
| COMPANY, a Wyoming Corporation, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. No. 08-2020 |
| ) | |
| DAREN SCOTT BERG, ) | |
| ) | |
| Defendant. ) | |

FILED

3:41 pm, 7/1/09

Tim J. Ellis
Clerk of Court

**OPINION ON OBJECTION TO DISCHARGE OF DEBT**

On April 23, 2009, this matter came before the Court for an evidentiary hearing on the Complaint Objecting to Discharge of Debt filed by Torrington Livestock Cattle Company, a Wyoming Corporation ("TLCC") and the Answer and Counterclaim filed by Daren Scott Berg ("Debtor"). The evidentiary hearing was continued to two additional settings of May 6, 2009 and May 15, 2009. The Court, having reviewed the record, the arguments of the parties, the testimony and evidence presented, is prepared to rule.

First, is the procedural issue of the Debtor's objection to Exhibit 15. TLCC offered Exhibit 15 into evidence at the beginning of the hearing on May 15, 2009. The Court allowed the Debtor time to review and provide a written response to the admission

Page 1

of Exhibit 15. The Court accepts Exhibit 15 into evidence, taking into consideration the Debtor's response.

TLCC filed a wide ranging complaint challenging the dischargeability of its debt under 11 U.S.C. §1141(d)(2) and (3), 11 U.S.C. §§523(a)(2) and (4), but also objecting to the Debtor's general discharge under 11 U.S.C. §§727(a)(2)-(5) and (7). At the end of the evidentiary hearings, TLCC filed Plaintiff's Motion to Amend the Pleadings to Conform to the Evidence to Allege a Cause of Action to Pierce the Corporate Veil. The Court, finding no objection was filed, entered its Order Granting Motion to Amend Pleadings to Conform to the Evidence to Allege a Cause of Action to Pierce the Corporate Veil on June 3, 2009.

**JURISDICTION**

This court has jurisdiction of this matter pursuant to 28 U.S.C. §§157 and 1334. These are core proceedings under §157(I) and (J).

**FACTS**

Debtor moved to Wyoming and initially worked as an employee for TLCC as a "field man" for about four years. As a "field man," Debtor bought cattle on behalf of TLCC. He was authorized to negotiate the price and buy cattle, paying by check drawn on the TLCC bank account. During the four years of employment with TLCC, the Debtor purchased several thousand head of cattle valued at several million dollars. Debtor also helped sell cattle by video and generate business for TLCC. TLCC grew to trust the

Debtor and relied upon him. When the Debtor left TLCC's employment in Spring 2007 to work for himself, the parting was amicable.

At the time the Debtor left TLCC, there was a verbal agreement between the parties that the Debtor would continue to use TLCC's bank account to purchase cattle. This is known in the industry as "clearing cattle." The Debtor was to then sell the cattle, repay TLCC from the proceeds and initially paid TLCC a commission of one dollar ($1.00) per 100 weight for the use of their funds. Sometime later, the parties renegotiated the commission rate to fifty cents ($.50) per 100 weight.

The Debtor, on the advice of his accountant, established the business entity 4B Livestock, Inc. ("4B Livestock") as a Wyoming corporation. 4B Livestock was established for the purpose of buying and selling cattle. The Debtor also established 4B Meats as a "dba" subsidiary of 4B Livestock for the purpose of selling meats. According to the testimony of Shawn Maddon ("Maddon") of TLCC, he was unaware that the Debtor had incorporated and thought the Debtor was working under the guise of "Daren Berg," although there was evidence presented that the checks written to TLCC for the reimbursement and commissions were written on 4B Meats checks.[1]

The procedure for clearing cattle with TLCC was that the Debtor bought the cattle, wrote the check on the TLCC bank account, then provided settlement statements to TLCC. A couple weeks later, Debtor submitted to TLCC a check that included the funds

---

[1] References to the "Debtor" include all transactions by Daren Berg, personally, on behalf of 4B Livestock, Inc. and 4B Meats.

to reimburse TLCC for the cost of the cattle and included TLCC's commission. Mr. Shawn Maddon, testifying on behalf of TLCC, testified that these arrangements worked well until August 2007 when the Debtor began providing the settlement statements, but did not submit the funds owed to TLCC. During September and October, 2007, the Debtor continued to write checks on TLCC accounts for the purchase of cattle but failed to provide the settlement statements or reimburse TLCC its funds or pay the commissions. The Debtor testified that he had been busy shipping cattle and was gone a couple weeks which led to him getting behind in his paperwork. Before he could get caught up, TLCC was demanding documents, funds and holding cattle for payment.

Upon discovering that there were issues with the accounting at TLCC, Maddon hired Ron Russell ("Russell"), owner of the business consulting firm, Russell Business Services in mid October 2007 to bring TLCC accounts up-to-date. Initially, Russell determined that TLCC's largest outstanding account receivable was the Debtor's account in an amount over $900,000. Within a few days, Russell calculated that the Debtor owed TLCC, over $1,400,000 for cattle clearing transactions since August 2, 2007.

On October 19, 2007, Maddon, Russell and the Debtor, met to discuss the outstanding funds. At the meeting, Maddon demanded access to the Debtor's business accounts and records. Debtor provided TLCC and Russell access to the 4B Livestock, 4B Meats and his personal accounts at the First State Bank in Torrington.

Russell began reconstructing the cattle purchases, sales, proceeds from the sales

and further purchases by analyzing bank records, invoices, bills of laden, the settlement statements and records provided by the Debtor, including records from the informal partnership that 4B Livestock had with L-Heart Cattle Company ("L-Heart").[2] Russell testified that after the analysis of all the transactions he was unable to correlate every transaction and account for the proceeds from the sale of the cattle, as the proceeds were "rolled over several times" when the cattle were sold and later when the boxed meat sold.

The Debtor and TLCC had an amicable working relationship, until such time that TLCC realized that the Debtor was not remitting the funds owed to it from August to mid-October. Even at that time, TLCC worked with the Debtor to attempt to reconstruct the financial history of the transactions. Mr. Maddon testified that, upon realizing that other feedlots and businesses were involved, he contacted Kevin Rozeboom of Simplot Feedlot, Dick Landon of Landon Livestock, and Scott Gibson ("Gibson") of Eastern Livestock. The Debtor had a similar arrangement for clearing cattle with Eastern Livestock as he did with TLCC. The Debtor had established cattle feeding operations with the feedlots.

On November 6, 2007, there was a meeting that included the Debtor, Maddon, Russell, and Gibson. At that time, the Debtor provided a list of outstanding accounts

---

[2] The Debtor testified that he had an agreement with Roy Limon of L-Heart. 4B Livestock bought cattle and delivered the cattle to the slaughter house. Mr. Limon sold the processed meats. Mr. Limon had all the "paper work" regarding these transactions, which the Debtor obtained to reconstruct the financial dealings connected to the use of TLCC funds.

receivables and inventory of products in cold storage in the amount of $668,300.[3] The list also indicated that the Debtor owed TLCC the amount of $671,752.66; and Eastern Livestock the amount of $909,369.40. Maddon testified that he and Gibson realized there would be a loss after all the funds were collected. Per Maddon's and Russell's testimony, the parties agreed that TLCC would collect all the accounts, deposit the funds into an account, divide the total proceeds equally and TLCC and Eastern Livestock would split the loss. Later TLCC discovered that Gibson and the Debtor entered into a different agreement after the meeting, whereas Eastern Livestock was paid nearly $300,000 and $12,000 was sent to TLCC. Subsequently, TLCC filed a civil suit in the State of Wyoming Eighth Judicial District, alleging: breach of contract, conversion, unjust enrichment, and fraud. Debtor filed his Chapter 11 bankruptcy petition on April 2, 2008, listing TLCC as an unsecured creditor with a debt of $609,399.00, "subject to counterclaim."[4]

During the hearing, Debtor testified and answered some of the questions regarding the business transactions. He also testified he would provide the documents to reconcile the transactions.

## DISCUSSION

TLCC filed an adversary action objecting to the Debtor's discharge, alleging

---

[3]Plaintiff's Exhibit 5.

[4]Debtor's Schedule "F".

multiple causes of action for the non-dischargeability. Before the Court can analyze the dischargeability issues, it is necessary to determine whether the Debtor's corporate entity, 4B Livestock, Inc. and the protections of the corporate veil insulate the Debtor from TLCC's allegations.

The Supreme Court of Wyoming, in its analysis in *Kaycee Land and Livestock*, listed factors that a court considers to determine whether to pierce the veil of a corporate entity.[5]

> As a general rule, a corporation is a separate entity distinct from the individuals comprising it. Wyoming statutes governing corporations do not address the circumstances under which the veil can be pierced.
>
> Piercing the corporate veil is an equitable doctrine. It is a judicially created remedy for situations where corporations have not been operated as separate entities as contemplated by statute, and are not entitled to be treated as such. The determination of whether the doctrine applies centers on whether there is an element of injustice, fundamental unfairness, or inequity.

Among the many possible factors pertinent to a court's determination of whether a corporate entity may be disregarded are, as relevant: commingling of corporate funds or assets to other than corporate uses; failure to segregate funds of the separate entities; the unauthorized diversion of corporate funds or assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue stock; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identification of the equitable

---

[5]*In re Kaycee Land and Livestock v. Flahive*, 46 P.3d 323 (Wyo. 2002).

owners thereof with the domination and control of the two entities; the failure to adequately capitalize a corporation, the use of a corporation as a mere shell; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors.[6]

It is apparent from the testimony and evidence presented that the Debtor commingled corporate funds and assets for his personal use. The Debtor failed to segregate corporate funds and expenses from those of his personal funds and expenses. He paid the corporate debts and his personal debts from which ever checking account had funds. The Debtor transferred money between accounts to insure that the account had sufficient funds to cover written checks. He purchased assets for the corporation with personal funds without proper transfer documents and used the assets both as a corporate asset and a personal asset. He purchased property from the corporate and subsidiary accounts for personal use. The Debtor did not provide testimony or evidence of even the most minimally adequate corporate records. 4B Livestock and its subsidiary 4B Meats were capitalized with a loan from the Debtor and his wife, documented by a check. The Debtor disregarded all legal formalities, other than filing the incorporating documents for the corporation. There was no arms length relationship between the Debtor and the corporation or its subsidiary. Debtor's own testimony indicated the assets and funds of 4B Livestock, Inc., 4B Meats, and his personal property were used indiscriminately

---

[6]*Kaycee Land and Livestock* at 325.

Page 8

between the two business entities and his personal and families' needs. The use of the corporation was a mere shell for the Debtor to operate his business and personal transactions. The Debtor diverted funds from the corporation and 4B Meats to personal accounts and to the new corporation that was later established by his wife. These diversions of funds from 4B Livestock and 4B Meats were a detriment to the creditor, as TLCC was not receiving its payments for reimbursement of the funds used by the Debtor. In this case, an adherence to the fiction of the separate existence of the corporation would promote injustice and the corporate entity protections of 4B Livestock may be disregarded.

**11 U.S.C. §727 (a)(3)**

The Court analyzes the dischargeability of the Debtor under 11 U.S.C. §727 (a)(3)[7], which states, as relevant,:

> "The court shall grant the debtor a discharge, unless...the debtor ...failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case."

In order to further the policy under the Bankruptcy Code of providing a debtor a "fresh start," all objections to discharge should be construed strictly against the creditor and liberally in favor of the debtor.[8] The purpose of §727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of the

---

[7] Further references to §727 refer to 11 U.S.C. §727.

[8] *In re Morris*, 302 B.R. 728, (Bankr. N.D. Okla., 2003).

Page 9

debtor's affairs and to test the completeness of the disclosure requisite to a discharge. The statute also ensures that the trustee and creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history.[9] The creditor has the burden of proving the elements of a §523 or §727 claim by a preponderance of the evidence.[10] In order to make a prima facie case under §727 (a)(3), a creditor must show: "(1) that the debtor failed to maintain and preserve adequate records; and (2) that the failure made it *impossible* to ascertain his financial condition and *material business transactions.*"[11] If the creditor makes that prima facie case, the burden shifts to the debtor to justify the failure to maintain records. The long standing rule in the Tenth Circuit is that records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of business. It is enough if they sufficiently identify the transaction that intelligent inquiry can be made respecting them.[12] Factors which a court may consider when determining the sufficiency of disclosures for the purpose of §727(a)(3) include: (1) whether the debtor was engaged in business, and if so, the complexity and volume of the business; (2) the amount of the debtor's obligations; (3) whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; (4) the Debtor's education, business experience and sophistication; (5) the

---

[9] *In re Phominh*, 339 B.R. 231 (Bankr. Colo. 2005).

[10] *In re Carlson*, BAP No. Wy-06-027, 2006 Bankr. LEXIS 3114 (Wyo. November 22, 2006) citing *Grogan v. Garner*, 498 U.S. 279 (1991).

[11] *In re Brown*, 108 F.3d 1290 (10th Cir. 1997).

[12] *In re Splawn,* 376 B.R. 747 (Bankr. N.M. 2007).

Page 10

customary business practices for record keeping in the debtor's type of business; (6) the degree of accuracy disclosed by the debtor's existing books and records; (7) the extent of any egregious conduct on the debtor's part; and (8) the debtor's courtroom demeanor.[13] In defending a cause of action seeking denial of discharge under §727(a)(3), a debtor may not use oral testimony to supplement information that is absent from the actual records.[14]

The testimony and evidence shows that the Debtor was engaged in the business of buying and selling cattle. This was a large volume business with large amounts of money changing hands rather quickly. The Debtor was highly experienced and skilled at this as he had been doing it since he graduated from high school. The Debtor's obligations to TLCC were to repay the TLCC funds and commissions. He obviously understood this as (1) the parties had a successful business relationship for many months; and (2) the Debtor had the same business relationship with Eastern Livestock. The extent of the debtor's records were his check books, settlement sheets, invoices and bills of laden. The debtor did not establish a system to account for the funds passing through his accounts. He did not have general, accounts receivable or accounts payable ledgers for his businesses. The testimony and evidence shows that the Debtor's obligations to TLCC is $474,674.40 for reimbursement of funds used to purchase cattle; $14,473.72, commissions and $107,086.00 interest.

The Debtor has a high school education and no accounting experience. He relied

---

[13]*Morris* at 736.

[14]*Splawn* at 759.

Page 11

on his checking accounts as business records, which he submitted to his accountant to prepare his annual taxes. Mr. Russell testified that a general ledger, and ledgers for accounts receivable and accounts payables is standard bookkeeping practices. The evidence presented to the court was that, in spite of his best efforts, Russell, was unable to determine, where nearly $500,000 of TLCC funds went after Debtor sold the cattle. Mr. Russell testified that his review of the Debtor's bank statements for 4B Livestock, 4B Meats and his personal account; invoices, and bills of laden were not sufficient to correlate all the transactions from the initial purchase of the cattle, to the end product of the sale of the boxed product as the funds were moved into accounts, reinvested into other cattle and rolled over several times.

It appears to the court that Debtor was playing "fast and loose" with his cattle buying operations without maintaining adequate business records of his transactions. He was to clear cattle through TLCC and Eastern Livestock. He had access to checking accounts for each of those businesses. He operated the 4B Meats business to sell the boxed meats. He established a cattle feeding program with different feedlots. It appears to the Court, Debtor used the funds from TLCC to partially finance these other business ventures.

At the hearings, Debtor made it clear that he blamed TLCC for the loss of business. His testimony indicated that because TLCC demanded an immediate accounting and payments, he was forced to sell cattle and boxed meats at lower prices causing the loss of profits. Debtor did not address his lack of payments to TLCC, per

their agreement, for the period after August 2007.  TLCC provided testimony and evidence to meet its prima facie burden that the Debtor failed to maintain and preserve adequate records.  The Debtor's failure made it impossible to ascertain the Debtor's financial condition and the material business transactions relating to the funds used by the Debtor and drawn on TLCC's account.

The burden then shifts to the Debtor to justify the failure to maintain records.  The Debtor testified that he has been a cattle buyer since graduating from high school.  He also testified that he had no college or business training.  He worked for TLCC for four years as a field man, buying cattle for TLCC.  He testified that only after Mr. Russell began assimilating documents to determine where TLCC funds had gone, did he work with a computer and any software.  Debtor testified that his wife did most of the accounting.

During the extensive testimony provided by the Debtor, and to the frustration of TLCC, the Debtor finally explained transactions that he was previously questioned during discovery.  Even with the testimony the Debtor's records did not provide the Court a good understanding of his financial condition and the material business transactions.

The Court does not doubt a general unsophistication of the Debtor's accounting ability.  However, the sheer volume of cattle, products, other business partners and funds that the Debtor dealt with required that the Debtor maintain adequate business records.  The Debtor was not inexperienced in the business.  His failure to maintain business records made it impossible for the Court to determine  his financial condition and follow

Page 13

the material business transactions related to clearing cattle. The Debtor did not justify his failure to maintain such records. Therefore the Court shall deny the Debtor's discharge under 11 U.S.C. § 727(a)(3).

Because the Court finds that Debtor's discharge should be denied under §727(a)(3), the Court need not consider whether denial of discharge is warranted under the other provisions raised by TLCC. The judgment shall be entered by separate order.

DATED this ___1___ day of ~~June~~ July, 2009

By the Court

_____
HONORABLE PETER J. MCNIFF
United States Bankruptcy Judge

Service to:
    Frank Jones
    Paul Hunter